UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:12-cr-86-NT |
| | ) | |
| DANIEL CARTER, | ) | |
| | ) | |
|        Defendant | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

The defendant, Daniel Carter, indicted on one count of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(8), Indictment (ECF No. 1), moves to suppress any evidence seized during a search of his bedroom in his parents' residence on November 14, 2010. Amended Motion to Suppress Evidence ("Motion") (ECF No. 33) at 1.  An evidentiary hearing was held before me on November 16, 2012, during which the defendant appeared with counsel. The government presented two witnesses and no exhibits.  The defendant offered three exhibits, all of which were admitted without objection.  The defendant called no witnesses.  After both sides rested, counsel for each argued orally.  I now recommend that the following findings of fact be adopted and that the motion be denied.

**I.  Proposed Findings of Fact**

On November 14, 2010, Andrew Redden, a patrol officer for the Rockland Police Department with approximately seven years of police experience, received a call to his cruiser from his dispatcher at approximately 9 p.m.  James Pease, then a detective sergeant with the Rockland Police, was in uniform and supervising the evening shift that night.  He overheard this

1

call.  Pease is now assigned to the Maine Drug Enforcement Agency as supervisor of the mid-coast area in Maine.

The dispatcher told Redden that a caller had reported that a juvenile female was being held against her will by the defendant at 22 Maple Street in Rockland.  Redden and Pease both responded to the call by driving to this address.  Both officers were familiar with the defendant and knew by the time they reached the house that he was in his 20s; that the female, who was 14 or 15 years old, was the victim of a crime with which the defendant had been charged and on which he was out on bail; that the defendant was subject to bail conditions that prohibited contact with the female (known in this proceeding as T.B.); and that the defendant was subject to a protection from abuse order concerning someone other than T.B.

Pease also knew that the defendant had been involved with a violation of a protection from abuse order concerning a different person, and that he had on one occasion been suicidal when police had talked him out of the house and taken him to the hospital.  Redden had arrested the defendant a few times for bail violations and similar charges, knew that the defendant had recently been using and selling "bath salts," and had encountered people using "bath salts" who were extremely paranoid, sweating, and hallucinating, and could be violent.

The officers drove to the house without using the cruisers' flashing lights or sirens, and at normal speeds.  They approached the front door of the house together.  Only one light was on in the house, in an upstairs window.  They knocked on the door for up to ten minutes, called out identifying themselves as Rockland police, and had the dispatcher call the telephone number associated with the house.  Due to the nature of the complaint and their knowledge of the defendant, the officers felt that it was important to speak with someone inside the house without

2

forcing their way in, although Pease testified that he was close to forcing entry when the door was opened by the defendant's mother.

The defendant's father was with his mother at the door; they were the owners of the house. The officers identified themselves. The parents told the officers that they had just awoken from sleep. In response to a question, they said that the defendant was in the house but did not have a female with him. They invited the officers into the foyer area of their house. The defendant then came down the stairs into the foyer.

The officers explained the complaint that had been received and asked the defendant is he had had any contact with T.B. The defendant denied any contact with T.B. The officers asked T.B. for permission to check his room or bedroom, which the defendant gave. The defendant appeared to be wide awake and did not appear intoxicated or impaired. The defendant led the officers up the stairs to an open room that did not have any walls or doors between the stairs and the space that the defendant occupied as a bedroom.

The officers perceived that the defendant had become somewhat nervous. As Pease climbed the stairs and his head came to the level of the floor of the defendant's room, he saw in the area under the defendant's bed a black shotgun. When all three men were standing in the bedroom area, the officers looked around and saw no sign of T.B. There was a blanket hanging over an opening in a wall around part of the room and Redden went through that opening to a corridor and another room, where he found T.B. hiding under a blanket.

While Redden was gone, Pease asked the defendant whether the shotgun was his. The defendant said that he had bought the shotgun to hunt, he was not a felon, and he did not have any bail conditions that prohibited him from possessing a gun. At some point the defendant and T.B. both confirmed that they had been smoking marijuana, which both officers could smell in

the room.  When Redden came back into the bedroom area with T.B., the defendant was arrested for violation of the conditions of his bail by having contact with T.B.  After he was handcuffed, Pease pulled the shotgun out from under the bed; the shotgun appeared to both officers to be shorter than a normal shotgun.  Pease seized the gun because he knew that anyone subject to a protection from abuse order should not have a gun.  Pease and Redden both testified on cross-examination that they knew that it was possible to be subject to such an order that did not prohibit the possession of a firearm.

Redden took T.B. down the stairs, followed by Pease with the defendant and the shotgun.  Redden took T.B. to her home in his cruiser.  Pease put the defendant and the shotgun into his cruiser.  Before he left the scene, Pease went over the defendant's protection from abuse order with the dispatcher over the radio.  He learned that the firearm prohibition was not checked on the form that had been used to issue the order, but he believed that state law still did not allow the defendant to have a firearm, so he kept the shotgun as evidence.  He also discussed with the dispatcher the handwritten section at the end of the form that recorded the parties' agreement that the court could consider a subsequent motion by the defendant that he be allowed to possess a gun for the hunting season in October 2009.  He later learned that the barrel of the shotgun had been measured and that it was of legal length.

At no time did the defendant or his parents ask the officers to leave the house or refuse to give them permission to enter the house or to search the defendant's bedroom space.  Redden testified credibly that he has never gone into a residence without first receiving permission to do so.

## II. Discussion

The defendant contends that the officers did not have consent to enter his parents' home or to search his bedroom space and that they did not have probable cause to seize his shotgun. I recommend that the court reject both arguments.

### A. Consent

The defendant asserts that the officers did not have consent to enter the house or to search his bedroom space. Motion at 3. The only evidence is to the contrary.

The government bears the burden of proving the lawfulness of warrantless searches and seizures, *see, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992), including traffic stops, *see, e.g., United States v. Gates*, Criminal No. 08-42-P-H, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008) (rec. dec., *aff'd* Feb. 12, 2009), arrests, *see, e.g., United States v. Jenkins*, Criminal No. 10-85-P-H, 2010 WL 3463736, at *5 (D. Me. Aug. 27, 2010) (rec. dec., *aff'd* Oct. 18, 2010), and consensual searches, *see, e.g., United States v. Reynolds*, No. CR-07-86-B-W, 2009 WL 1090674, at *3 (D. Me. Apr. 21, 2009), *aff'd*, 646 F.3d 63 (1st Cir. 2011) ("In addition to the requirement that it be based on valid consent, a consensual search may not exceed the scope of the consent given. The Government must prove by a preponderance of the evidence that the consent given was valid and that the search did not exceed its scope.") (citations and internal punctuation omitted).

Redden testified that the officers received consent from the defendant's parents to enter the house and, indeed, that he would not have entered the foyer without such permission. Both officers testified that the defendant consented to their search of his bedroom space. There is no contradictory evidence in the record, and the officers' testimony was fully credible.

5

The defendant's final argument on this issue is that Pease's seizure of the shotgun was beyond the scope of his consent and therefore illegal.  Specifically, he contends that his consent was limited to a search of areas where T.B. might be located, and Pease knew that she was not under the bed, having seen that area on his way up the stairs.  This argument—that Pease was prohibited from seizing what was in plain sight under the bed because of what was not in plain sight under the bed—cuts much too fine a point.  Assuming *arguendo* that the defendant consented only to a search for T.B. in his bedroom space, an assumption not necessarily borne out by the testimony of the officers, case law makes clear that Pease nonetheless could seize any evidence of a possible crime that was in plain sight during that search or in the area to be searched.  *E.g., United States v. Livingston*, 429 Fed.Appx. 751, 754-55, 2011 WL 2678586, at **3 (10th Cir. July 11, 2011) (upholding seizure of firearm and counterfeit bills from unzipped duffle bag located in closet where defendant, for whom officers were searching, was located); *United States v. Scott*, 463 Fed.Appx, 216, 218, 2012 WL 340222, at **2 (4th Cir. Feb. 3, 2012) (upholding seizure of contraband in plain view while officers were searching within scope of consent to search for other items).

This conclusion makes it unnecessary to address the government's alternative arguments. The defendant is not entitled to suppression of the shotgun on the basis of his consent argument.

### B.  Probable Cause

The defendant next contends that the officers lacked probable cause to believe that the shotgun was evidence of a crime at the time it was seized.  Motion at 4.  As his motion says:

> Probable cause exists when a police officer has "information upon which a reasonable prudent person would believe that the suspect had committed or was committing a crime.  The inquiry focuses upon what the officer knew at the time of the [seizure], and should evaluate the

6

>> totality of the circumstances." *United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006).

*Id.*

Pease, the officer who seized the shotgun, testified that he was aware of the existence of a protection from abuse order against the defendant before he arrived at the house. Counsel for the defendant emphasized in oral argument that Redden testified that he did not know whether he became aware of the existence of the order before or after he entered the house, but it is not necessary that both officers have been aware of the existence of the order in order for Pease to have had probable cause to seize the shotgun. Counsel for the defendant also emphasized the officers' admissions that they knew that protection from abuse orders issued by Maine courts do not always prohibit the possession of firearms,

Pease testified that this knowledge was the reason why he did some "research" with his dispatcher before leaving 22 Maple Street with the defendant and the shotgun. Counsel for the defendant argued orally that the seizure of the shotgun was complete when Pease removed it from under the defendant's bed, and that his review of the actual terms of the order at issue with the dispatcher before he left the scene could not provide him with timely probable cause to seize the shotgun.[1]

Pease clearly testified that he thought that the defendant's possession of a gun might be a violation of the protection from abuse order at the time he seized it. Maine law prohibits possession of a firearm, "unless that person has obtained a permit under this section," by a person who is subject to an order of a state court "that restrains that person from harassing, stalking or threatening an intimate partner." 15 M.R.S.A. § 393(1)(D). In my recommended

---

[1] In my recommended decision on the defendant's motion to dismiss the indictment, issued today, I conclude that the handwritten addition to the order at issue, Defendant's Exhibit 1, could reasonably have been construed to prohibit the defendant from possessing a firearm, even though the box for that provision on the standard form was not checked. Thus, Pease had probable cause to seize the shotgun after discussing the specific terms of the order with his dispatcher, but that issue need not be reached in this case.

7

decision on the defendant's motion to dismiss, I have rejected his argument that this statute does not apply when a protection from abuse order is entered by agreement of the parties, rather than after a contested hearing.  Thus, regardless of whether the specific protection from abuse order issued in this case had a check mark in the box next to the line prohibiting the defendant from possessing a firearm, he was so prohibited under Maine law.  Nothing further is required to meet the objective legal standard justifying a warrantless seizure.  *See United States v. Dunbar*, Criminal Action No. 06-386, 2007 WL 1451437, at *1-*2 (W.D. Pa. May 15, 2007) (upholding seizure of ammunition during search pursuant to warrant for other items when officers knew that defendant had restraining order against him and knew that such individuals were prohibited from possessing ammunition; officers not required to have read restraining order itself).

This conclusion makes it unnecessary to consider whether Pease's subsequent review of the actual terms of the protection from abuse order vitiated any possible taint in his initial seizure of the shotgun, as well as the government's alternative arguments based upon the officers' belief that the shotgun might have been illegally altered and the defendant's admitted use of marijuana and previous use of "bath salts."  It is also unnecessary to consider the defendant's argument that the absence of a check mark next to the provision prohibiting the defendant from possessing a firearm on the form on which the protection from abuse order was recorded "overrides" any contradictory language in the handwritten addendum at the end of that order.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and the motion to suppress be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of November, 2012.

                                                /s/ John H. Rich III
                                                John H. Rich III
                                                United States Magistrate Judge